FILED
2013 Jun-28  PM 01:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| SHARON BLAIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case Number: |
| v. | ) | 4:12-cv-1776-JEO |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action originally filed in state court, Plaintiff Sharon Blair brings a claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that her Long Term Disability ("LTD") benefits under an employee welfare benefit plan were wrongfully terminated. (Doc.[1] 1-1 at 3-4 ("Complaint" or "Compl")). Defendant Metropolitan Life Insurance Company ("MetLife"), the plan's claims administrator, removed the action to this court. (Doc. 1). The case was assigned to the undersigned United States Magistrate Judge pursuant to a general order of reference, and the parties have consented to an exercise of plenary jurisdiction. *See* 28 U.S.C. § 636(c), FED. R. CIV. P. 73, and LR 73.2. The cause now comes to be heard on five pending motions: (1) Plaintiff's motion for partial summary judgment, on the issues of the applicable standard of review and the scope of the evidence to be considered (Doc. 14); (2) Plaintiff's motion for discovery (Doc. 15); (3) Plaintiff's

---

[1] References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet.

motion "for judgment on liability" (Doc. 18); (4) MetLife's cross-motion "for judgment as a matter of law" (Doc. 23); and (5) Plaintiff's motion to remand the action to allow MetLife to conduct further review.  (Doc. 29).  The motions have been fully briefed and are ripe for decision.  Upon consideration, the court concludes that MetLife's motion for judgment as a matter of law (Doc. 23) is due to be granted and that all of Plaintiff's motions are due to be denied.

## I.    BACKGROUND

### A.    Plaintiff is Awarded LTD Benefits Under the Plan

Plaintiff, a woman born in 1958, is a former employee of Progressive Corporation ("Progressive"), an insurance company.  (1164[2]).  She worked as a Claims Specialist, a job entailing, *inter alia*, analyzing and determining Progressive's liability for loss or damages, attempting settlement with claimants and attorneys, corresponding with and interviewing witnesses and claimants, and calculating and paying claims.  (1120-21).  Plaintiff's last active day of work was August 13, 2007.  It appears that she was hospitalized on that date for one day because of an episode at work in which she experienced stroke-like symptoms, including left-sided paralysis.  (1081).

Progressive established an employee welfare benefit plan (the "Plan") that includes LTD coverage.  It is undisputed that the Plan is subject to ERISA.  As relevant here, under the Plan,

---

[2]Citations to one or more numerals within parentheses are to the "Bates Stamp" page number(s) of the administrative record that MetLife filed under seal.  Volume I of the administrative record encompasses pages 1 through 599 and is Doc. 11.  Volume II encompasses pages 600-1170 and is Doc. 12.  All pages of the administrative record are stamped "MetLife-Blair-" followed by a four-digit numeral, *e.g.*, "0035."  When cited herein, however, pages in the administrative record do not include zeros to the left of the first "non-zero" digit.  Thus, the page stamped "MetLife-Blair-0035," for instance, would be cited simply as "(35)."

the term "Disabled" or "Disability" means that, "due to Sickness, pregnancy or accidental injury

[the employee is] receiving Appropriate Care and Treatment and complying with the

requirements of such treatment; and"

> 1.   during the Elimination Period and the next 24 months of Sickness or
> accidental injury, [the employee is] unable to earn more than 80% of [the
> employee's] Pre-disability Earnings or Indexed Pre-Disability Earnings at
> [the employee's] Own Occupation from any employer in [the employee's]
> Local Economy; or
>
> 2.   after the 24 month period, [the employee] is unable to earn more than 80%
> of [the employee's] Pre-disability Earnings from any employer in [the
> employee's] Local Economy at any gainful occupation for which [the
> employee is] reasonably qualified taking into account [the employee's]
> training, education, experience and Pre-Disability Earnings.

(31).  The Plan also provides that benefits for disability resulting from a "mental or nervous

disorder or disease" are generally subject to a 24-month limitation.  (7, 27, 39).  By its terms, the

Plan grants MetLife, the claims administrator, discretionary authority and provides that MetLife's

determinations "shall be given full force and effect" unless "arbitrary and capricious."  (15, 27,

42, 54).

On November 13, 2007, MetLife received a claim from Plaintiff seeking LTD benefits

under the Plan.  (1164).  Plaintiff's Personal Profile, a document she submitted in support of her

claim, identifies her work-limiting impairments as left-side pain, numbness, headaches, and

difficulty with concentration and memory.  (1103).  On January 8, 2008, MetLife approved

Plaintiff's claim, granting LTD benefits retroactive to November 13, 2007, based upon a

determination that she had a "mental or nervous disorder or disease" (1045-46), specifically,

recurrent major depression.  (140).  Accordingly, Plaintiff was advised that her LTD benefits

were subject to a 24-month maximum and were thus scheduled to cease as of November 12,

2009. (1046). MetLife further advised that in order to remain eligible for LTD benefits, Plaintiff "must continue to satisfy the definition of disability and all other requirements" under the Plan and that she would be periodically required to provide updated medical information regarding her disability. (*Id.*)

Also on January 8, 2008, Plaintiff applied for Social Security benefits. (1027-28). On March 7, 2008, the Social Security Administration ("SSA") notified Plaintiff that her application had been approved and that she would receive benefits effective February 2008.[3] (1022-25). After Plaintiff advised MetLife of the SSA's favorable decision (173-47, 1021-25), her LTD benefits were offset by the amount she began receiving from Social Security, as provided under the Plan. (5, 34, 35, 1008-09).

## B.    MetLife Terminates Benefits

On March 14, 2008, MetLife advised Plaintiff that it needed additional information from her and her healthcare providers to verify that she continued to be eligible for LTD benefits. (996). MetLife also faxed medical record requests to Plaintiff's three then-treating doctors of record: Dr. Rafael A. Beltran, a psychiatrist; Dr. A. Bartow Ray, a psychologist; and Dr. John A. Just, a neurologist. (996). When MetLife initially failed to receive the records, it terminated Plaintiff's LTD benefits effective May 14, 2008. (1006). However, MetLife soon thereafter received records from Dr. Just and Dr. Ray and advised Plaintiff in a letter dated May 28, 2008

---

[3]Plaintiff often states in her briefs that she was awarded Social Security benefits based on an "onset date" of August 2007. (*See, e.g.*, Doc. 19 at 1, 4; Doc. 25 at 2). However, the only evidence that Plaintiff offers for that proposition is a citation to the SSA's March 7, 2008 notice that her benefits application had been approved. (*Id.*) That notice, however, states that Plaintiff was found to be "entitled to monthly disability benefits beginning February 2008," (1022), not August 2007.

that her benefits were reinstated effective May 15, 2008.  (993).

However, on August 20, 2008 and September 30, 2008, MetLife again requested that Plaintiff provide recent medical information.  (967, 974, 984, 987).  After receiving updated medical records from Dr. Just and Dr. Ray, MetLife notified Plaintiff by letter dated November 6, 2008, her records no longer supported that she could not perform the duties of her claims specialist position.  (949-52).  As a result, MetLife terminated Plaintiff's LTD benefits, effective the date of the notice.  (*Id.*)

### C.     MetLife Denies Plaintiff's Administrative Appeal

Plaintiff timely pursued an administrative appeal of MetLife's decision.  (943).  For that review, MetLife enlisted Dr. Lee H. Becker, a psychiatrist, and Dr. Sheri Phillips, a physician board-certified in occupational medicine, to evaluate Plaintiff's medical records.  After doing so, Dr. Becker and Dr. Phillips authored respective reports, each concluding that Plaintiff's medical records did not support that Plaintiff suffered from impairments that rendered her unable to perform the duties of her occupation from November 7, 2008 and ongoing.  (926-33; 935-38).  MetLife faxed those reports to Drs. Just  and Ray, respectively, on January 16, 2009, soliciting their comments and additional clinical evidence if they disagreed with the reports.  (856, 839).  Not having received a response, MetLife faxed the reports to Drs. Just and Ray a second time on January 22, 2009, requesting comments and additional clinical evidence by the next day.  (925, 904).

On January 30, 2009, still not having heard from Dr. Just or Dr. Ray, MetLife issued its decision denying Plaintiff's administrative appeal.  (824-27).  Although MetLife's letter of November 6, 2008, terminating Plaintiff's benefits had not referenced that Plaintiff had been

5

awarded Social Security benefits, MetLife's letter rejecting Plaintiff's appeal expressly

acknowledged that fact. (825). MetLife explained, however, that a Social Security award "does

not guarantee the approval or continuation of [LTD] benefits" and that the SSA's "determination

is separate from and governed by different standards than MetLife's review and determination

pursuant to the terms of [the Plan]." (825). After setting forth a summary of the respective

reports of Drs. Becker and Phillips, MetLife stated that those reports and the "available medical

documentation" failed to support functional impairment or restrictions which would preclude

Plaintiff from performing her own occupation for any employer beyond November 7, 2008.

(826). Therefore, MetLife found that Plaintiff "failed to satisfy the Plan's definition of disability

and the previous decision to terminate LTD benefits for the time period in question is upheld."

(827). The notice concluded by advising that the latest "review constitutes MetLife's final

determination on Appeal in accordance with the Plan and federal law" and that Plaintiff had the

right to file a civil lawsuit under ERISA. (*Id.*)

### D.    Plaintiff Retains Counsel and Seeks Additional Administrative Review

Just over four months later, MetLife received a letter dated June 3, 2009, from Myron K.

Allenstein, an attorney retained by Plaintiff, in which he requested copies of all documents

related to the decision to discontinue benefits. (822). Plaintiff's counsel further requested 45

days from the date such materials were mailed to him to submit additional information or

arguments in support of Plaintiff's claim. (822). MetLife sent Allenstein a copy of its claim file

but also reiterated that Plaintiff had been notified that she had exhausted administrative remedies

under the Plan and was thus free to file suit. (820). MetLife indicated, however, it was "willing

to conduct one further review and [would] accept any additional information [counsel] wish[ed]

6

MetLife to consider in support of [Plaintiff's] claim, until July 31, 2009." (820-21).

On July 16, 2009, Plaintiff's counsel acknowledged receipt of MetLife's claim file on Plaintiff and provided MetLife with a copy of an affidavit from Plaintiff. (816-17). In that affidavit, Plaintiff recounted that she has been diagnosed with severe depression, a bipolar condition, fibromyalgia, and migraine headaches. (817). She also averred that she has "chronic left sided pain, numbness, weakness, and tingling," that she suffers three to four seizures per week, and highlighted that she had been approved for Social Security benefits without a hearing. (817). On July 29, 2009, Plaintiff's counsel sent MetLife a questionnaire completed by Dr. Ray the preceding day, wherein he opined that Plaintiff had long been and would permanently be unable to perform any kind of substantial gainful work. (813-15). Dr. Ray further explained that Plaintiff's disability was based on her "altered mental status due to a neurological problem, confusion," and "[reduced] concentration, [short term memory], productivity, [and increased] anxiety and emotional problems." (815).

Although MetLife had stated that it would agree to consider materials submitted through July 31, 2009, Plaintiff's counsel further advised in his letter dated July 29, 2009, that he anticipated submitting still more records. (813). Indeed, in separate letters sent in September and December 2009, Plaintiff's counsel also stated that he anticipated submitting additional records, further asserting to MetLife that it had a continuing duty under ERISA to consider any additional information whenever he might submit it. (811, 812). Although there were numerous occasions thereafter in which Plaintiff's counsel suggested that he was, or by a certain date would

be, done submitting additional materials[4], and other occasions where MetLife indicated that it

desired to resolve the claim based on the file as supplemented,[5] Plaintiff's counsel kept sending

additional materials to MetLife periodically over the course of the next two-plus years.  Those

additional submissions from Plaintiff included the following:

> **December 2009:**  Records showing that the Gadsden Fire Department
> responded to a call to find Plaintiff on the floor of her home following
> "stroke/seizure type activity," prompting transportation to Riverview Regional
> Medical Center (808-10); at that time, an emergency room physician diagnosed
> Plaintiff with "pseudoseizures" (785, 794-807), generally defined as "attack[s]
> resembling ...epileptic seizure[s] but having purely psychological causes"[6]; in the
> initial assessment, however, it is noted that Plaintiff "currently lives with spouse
> ... and 3 adopted toddlers" and that she "performs [activities of daily living]
> independently" (801);

> **December 2009:** Plaintiff sees another physician, Dr. Jane Teschner, who
> authored a report in May 2010 based upon that visit, stating (1) an opinion that
> Plaintiff was disabled from disabling multiple sclerosis ("MS"), based upon Dr.
> Teschner's interpretation of the August 2007 MRI and (2) a previously
> undiagnosed thyroid nodule in Plaintiff's left lobe  (745-54).

> **July to September 2010:** Additional records from Gadsden Regional Medical

---

[4]*See, e.g.,* (785) (letter from Plaintiff's counsel dated  12/11/09, advising MetLife that he
intended to submit additional records within 30 days); (783) (letter from counsel dated 3/30/10
asking that MetLife's "claim file be reopened and held open for 14 days" to allow for the
submission of another physician report); (782) (letter from counsel dated 5/6/10 asking for the
administrative record to be held open until 6/28/10); (522) (e-mail dated 12/9/10 from Plaintiff's
counsel confirming an agreement to keep the file open until 1/2/11); (519-20) (March 2011
correspondence indicating that MetLife acceded to counsel's request to have until 4/15/11 to
submit another physician statement); (518) (letter from counsel dated 4/12/11 asking to keep the
file open until 5/1/11); and (508) (letter from counsel dated 6/1/11 stating that he had no
additional evidence to submit).

[5]*See, e.g.,* (744) (letter from MetLife dated 6/14/10 advising that it had commenced
review of Plaintiff's claim and would notify counsel in writing of the outcome); (704) (letter
from MetLife dated 9/20/10 advising that the record on Plaintiff's claim would remain open until
10/15/10).

[6]http://medical-dictionary.thefreedictionary.com/pseudoseizure

Center disclosing that Plaintiff had undergone a left thyroidectomy, noting that removed tissue was cancerous (711-13), with associated follow-up examinations (531-665);

**July 2010:** a report from another neurologist, Dr. Chris LaGanke, recited Plaintiff's complaints but described normal findings upon both physical and neurological examination, stating a primary diagnosis of "Probable complicated migraine VS simple partial seizure" (705-08);

**September 2010:** in an "addendum" to her original report, Dr. Teschner disputed the thoroughness of Plaintiff's prior neurological examinations and asserted that her "symptoms were cavalierly and probably erroneously attributed to psychiatric reasons"; Dr. Teschner further insisted that it "is clear that [Plaintiff] has a physical etiology for her total disability," although she backed off a formal MS diagnosis, acknowledging that there had been no "solid neurologic findings yet." (701-03);

**October 2010:** according to the reviewing radiologist, a new brain MRI ordered by Dr. Laganke revealed "several small foci of increased signal ... within the deep white matter of right and left frontal lobes, right slightly more numerous than left. These are nonspecific in appearance and could represent MS plaque disease or some other process" (526-27);

**May 2011:** in an updated report from Dr. LaGanke, he gives a diagnosis of "demyelinating disease (MS)," from which, he suggested, Plaintiff had been "suffering .... without proper diagnosis for several years"; such was based, he said, upon the October 2010 MRI, which he described as "abnormal"; he further added that Plaintiff's new symptomatic complaints "indicate[ ] progression of the MS"; he also diagnosed Plaintiff with rheumatoid arthritis and Sjogren's Syndrome[7] (515-17; *see also* 510-11);

**September 2011:** an evaluation report from Dr. David R. Wilson, a psychologist, who saw Plaintiff, reviewed her records, and diagnosed her with recurrent major depression, and assigned a GAF score of 50 (420-26);

**December 2011:** in another statement, Dr. LaGanke stated that while he had diagnosed Plaintiff with "demyelinating disease," he clarified that he had *not* diagnosed her with MS; rather, he explained that Plaintiff's "MRI reveals

---

[7]Sjogren's (SHOW-grins) syndrome is a disorder of the immune system identified by its two most common symptoms — dry eyes and a dry mouth.  It often accompanies other immune-system disorders, such as rheumatoid arthritis. http://www.mayoclinic.com/health/sjogrens-syndrome/DS00147.

demyelinating lesions" that were merely "suspicious for [MS]" and that her "symptoms and history are increasingly consistent with MS"; Dr. LaGanke reiterated his opinion that Plaintiff is unable to work due to her impairments (416-17).

On February 13, 2012, Plaintiff's counsel sent a letter to MetLife referencing his letter of December 12, 2011, which had accompanied Dr. LaGanke's latest statement. (413). Plaintiff's counsel highlighted that he had stated in the December 2011 letter that he had no other evidence to submit (413). He concluded: "The 45-day deadline for a response has passed. I ask that benefits be paid forthwith." (*Id.*)

On April 3, 2012, with no further decision having come from MetLife and without any further communication between the parties, Plaintiff, through her counsel, filed this action in the Circuit Court of Etowah County, Alabama, claiming that she was entitled to LTD benefits under ERISA § 502, 29 U.S.C. § 1132. (Compl. ¶ 9). MetLife removed the action to this court based on federal question jurisdiction.[8] (Doc. 1). MetLife answered, denying liability (Doc. 2), and it later filed under seal a copy of the administrative record. (Docs. 10, 11, 12).

The parties thereafter filed the five motions that are now pending before the court. First,

---

[8]In its notice of removal, MetLife relied upon the "complete preemption" doctrine (*see* Doc. 1 ¶¶ 4-8), whereby a nominal state-law cause of action is not only preempted but affirmatively supplanted by an ERISA cause of action, over which a federal district court may exercise federal question jurisdiction under 28 U.S.C. § 1331. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-09 (2004); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987). However, as MetLife acknowledges, Plaintiff's state-court complaint *expressly pleads* ERISA as the basis of her claim. (Compl. ¶ 9; Doc. 1 ¶¶ 4, 6(b)). Despite that, MetLife argued that Plaintiff's claim is "completely preempted under ERISA." (Doc. 1 ¶¶ 4, 6(b)). Resort to such a theory, however, is unnecessary. Because Plaintiff has pled her claim as arising under ERISA, there simply is no issue of ERISA preemption, "complete" or otherwise. Rather, the action was removable based upon a straightforward exercise of federal question jurisdiction over the pled ERISA claim. *See Chilton v. Savannah Foods & Industries, Inc.*, 814 F.2d 620, 623 (11th Cir. 1987).

Plaintiff moved for partial summary judgment, on the particular issues of (1) whether a *de novo* standard of review applies and (2) whether the record to be considered by the court consists of all submissions up to the filing of suit on April 3, 2012.  (Doc. 14).  Second, Plaintiff filed a contemporaneous motion to allow discovery, based upon a claim that MetLife had a conflict of interest when it terminated her benefits and denied her appeal.  (Doc. 15).  MetLife filed a brief objecting to such discovery (Doc. 16), and Plaintiff filed a reply thereto.  (Doc. 17).  Third, Plaintiff moved for summary judgment on liability, arguing that, although she is entitled to discovery, she can show that she is entitled to prevail as a matter of law based on the existing record.  (Doc. 18).  MetLife then filed a consolidated response to Plaintiff's summary judgment motions.  (Doc. 22).  Fourth, MetLife filed its own cross-motion for summary judgment (Doc. 23), with a supporting brief.  (Doc. 24).  Plaintiff filed a brief in opposition (Doc. 25), to which MetLife filed a reply.  (Doc. 26).  Fifth and finally, Plaintiff moved for a remand for further administrative proceedings to require MetLife to reconsider Plaintiff's claim in light of all of the materials that Plaintiff submitted following the denial of her appeal on January 30, 2009.  (Doc. 29).  MetLife filed a brief in opposition to such a remand (Doc. 31), and Plaintiff filed a reply. (Doc. 32).  Allowed to fire the last shot, MetLife filed a final brief arguing against remand. (Doc. 34).

## II.    ERISA REVIEW STANDARDS

Where, as here, an employee welfare benefit plan is governed by ERISA, a beneficiary is authorized to bring suit to recover benefits or enforce rights under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  "ERISA itself provides no standard for courts reviewing the benefits decisions of plan administrators or fiduciaries."  *Blankenship v. Metropolitan Life Ins. Co.*, 644

F.3d 1350, 1354 (11th Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

108-09 (1989)).  However, based on the Supreme Court's guidance in *Firestone* and

*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Eleventh Circuit has established a

multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits

decisions. *See Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137-38 (11th Cir. 2004),

*overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352

(11th Cir. 2008).  For a court reviewing a plan administrator's benefits decision, the present

*Williams* test goes this way:

> (1) Apply the *de novo* standard to determine whether the claim administrator's
> benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the
> administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine
> whether he was vested with discretion in reviewing claims; if not, end judicial
> inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with
> discretion in reviewing claims, then determine whether "reasonable" grounds
> supported it (hence, review his decision under the more deferential arbitrary and
> capricious standard[9]).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the
> administrator's decision; if reasonable grounds do exist, then determine if he
> operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take
> into account when determining whether an administrator's decision was arbitrary
> and capricious.

*Blankenship*, 644 F.3d at 1355 (footnote added) (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d

_____

[9]In ERISA cases, the phrases "arbitrary and capricious" and "abuse of discretion" are
used interchangeably.  *Blankenship*, 644 F.3d at 1355 n. 5 (citing *Jett*, 890 F.2d at 1139).

1189, 1195 (11th Cir. 2010)).  Review of the plan administrator's decision to deny or terminate

benefits is limited to consideration of the material available to the administrator at the time it

made its decision.  *Blankenship*, 644 F.3d at 1354 (citing *Jett v. Blue Cross & Blue Shield of

*Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989)).

## III.   DISCUSSION

### A.   MetLife Benefit Decision(s) Subject to Judicial Review

A key battle is joined at the outset with the parties disagreeing sharply over what decision

or decisions by MetLife are properly subject to judicial review at this time.  That dispute, in turn,

has bearing on two related procedural issues, namely, (1) the standard of review and (2) the

evidentiary materials to be considered by the court.  Those related matters also happen to be the

subject of Plaintiff's motion for partial summary judgment.  (Doc. 14).

MetLife's position on these issues is straightforward.  It asserts that the only decision

subject to review is its denial of Plaintiff's administrative appeal on January 30, 2009.  As a

result, MetLife says, only the materials that were before it at the time of that denial may be

considered by the court.  And because the Plan expressly grants MetLife discretionary authority

relative to all material aspects of Plan interpretation and benefit eligibility, MetLife continues,

the court's review is limited to an assessment of whether the rejection of Plaintiff's appeal was

arbitrary or capricious.  That is so, MetLife says, despite admitting that it has an "inherent

conflict of interest as the funder of benefits and the adjudicator of claims under the Plan."  (Doc.

16 at 7).

Plaintiff does not dispute that MetLife's January 30, 2009 denial decision is subject to

review.  However, in her motion for partial summary judgment as it relates to the standard and

scope of review, Plaintiff focuses much more upon what she identifies as MetLife's "deemed denial" of her "second appeal." (Doc. 14 at 1-2).  According to Plaintiff, when MetLife agreed in response to her counsel's request in June 2009 to consider additional information, that triggered a "second appeal" of the adverse benefits decision.  (*Id*. at 1).  Plaintiff further argues that because MetLife never issued a decision on that "second appeal" prior to suit being filed, that appeal was constructively denied.  That denial, she continues, is now subject to judicial review in light of all materials submitted to MetLife up to the time suit was filed.  And while Plaintiff does not contest MetLife's assertion that it is vested under the Plan with discretionary authority to interpret the Plan's terms and determine benefit eligibility, Plaintiff insists that because MetLife failed to decide her "second appeal," MetLife exercised no discretion to which the court might defer.  As a consequence, Plaintiff argues, *de novo* review of the "deemed denial" is warranted.

In reply, MetLife contends that Plaintiff's motion for partial summary judgment on the standard and scope of judicial review is due to be denied because, MetLife insists, there was no "second appeal" nor any "deemed denial" thereof.  Rather, MetLife emphasizes that, under both the Plan and applicable regulations, Plaintiff was entitled to, and received a timely decision upon, only a single appeal of the termination of her LTD benefits.  MetLife admits that it thereafter afforded Plaintiff the chance, at the request of her attorney, to submit additional information in support of her claim.  However, MetLife characterizes its consideration of such materials as an "extra-contractual courtesy review" that was outside of the Plan terms and was exempt from time limitations applicable to appeals under ERISA.  (Doc. 22 at 2).  MetLife also highlights that Plaintiff was on notice, by the January 30, 2009 letter denying her appeal and by correspondence to her counsel dated June 16, 2009, that MetLife considered Plaintiff to have exhausted

14

administrative remedies as of the denial of her appeal and that she could file an ERISA lawsuit at any time.  Finally, MetLife maintains that while it was attempting to complete its courtesy review, Plaintiff short-circuited the process by filing suit prior to a decision being reached in a strategic gambit to avoid the abuse-of-discretion standard of review in favor of a *de novo* standard.

Under ERISA, a claimant is entitled to a "full and fair review" of an adverse benefit determination.  29 U.S.C. § 1133(2).  The procedures generally required for administrative review are spelled out in relative detail in 29 C.F.R. § 2560.503-1, a regulation promulgated by the Department of Labor.  *See Davila*, 542 U.S. at 220; *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008).  Under the regulation, a claimant must be afforded at least one administrative appeal of an adverse benefits decision.  29 C.F.R. § 2560.503-1(h)(1).  Further, claimants must generally exhaust available administrative remedies under their plans before they may bring suit under ERISA in federal court.  *See Kahane v. UNUM Life Ins. Co. of Amer.*, 563 F.3d 1210, 1214 (11th Cir. 2009) (citing *Springer v. Wal-Mart Assocs.' Group Health Plan*, 908 F.2d 897, 899 (11th Cir. 2009)); *Watts v. BellSouth Telecomm., Inc.*, 316 F.3d 1203, 1206-07 (11th Cir. 2003).  Pursuant to the regulation, a plan may provide for more than one level of administrative appeal but may not require a claimant to pursue more than two appeal levels to exhaust administrative remedies. 29 C.F.R. §§ 2560.503-1(c)(2), (c)(3), (d).  For claims involving disability benefits, the claims administrator generally is required to notify a claimant "of the plan's benefit determination on review within a reasonable time, but not later than [45] days after receipt of the claimant's request for review," although the plan may, upon a finding of special circumstances and with timely notice to the claimant, extend the review period by up to

15

an additional 45 days.  *Id.*, §§ 2560.503-1(i)(1)(i), (i)(3)(i); *see also D & H Therapy Assoc., LLC v. Boston Mut. Life Ins. Co.*, 650 F. Supp. 2d 143, 150-51 (D.R.I. 2009).  The regulation provides that those time limits apply regardless of "whether the plan provides for one or two appeals."  29 C.F.R. § 2560.503-1(i)(3)(i).  Finally, the regulation provides that if a plan fails to "establish or follow claims procedures consistent with" the substantive review requirements mandated by the regulations, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue" judicial remedies.  *Id.*, § 2560.503-1(*l*); *see also Torres v. Pittston Co.*, 346 F.3d 1324, 1332-33 & n. 10 (11th Cir. 2003); *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008).

Plaintiff does not appear to argue that the Plan's claim procedures, at least as formally established, fail to comply with the dictates of the regulation regarding "full and fair review." Plaintiff contends, rather, that once she advised MetLife on December 12, 2011, that she had no further evidence to submit on her "second appeal," MetLife had 45 days, or at most 90 days, in which to notify her of its decision on that appeal, presumably under 29 C.F.R. §§ 2560.503-1(i)(1)(i), (i)(3)(i); (*see also* 413).  Because MetLife did not do so, she says, MetLife constructively denied her "second appeal," making it subject to *de novo* review based all evidence in the administrative record up to the time suit was filed.  However, earlier this year the Eleventh Circuit issued an unpublished opinion that rejected those very same arguments in affirming a judgment entered by Judge Hopkins of this court.  As here, the claimant in that case, *Harvey v. Standard Ins. Co.*, 850 F. Supp. 2d 1269 (N.D. Ala. 2012), *aff'd*, 503 Fed. App'x 845, 847 (11th Cir. 2013), sought disability benefits under an employee welfare benefit plan governed by ERISA.  503 Fed. App'x at 847.  When Harvey's claim was denied by the plan administrator,

Standard, she pursued an administrative appeal.  *Id.*  After that was denied, Harvey retained

Myron Allenstein, the same attorney representing Plaintiff in the case *sub judice*.  As here,

Attorney Allenstein requested an opportunity for further administrative review.  *Id.*  Standard

notified him that it had already completed the one review required by the plan but that it would

perform a "voluntary 'extra-contractual' review, which would not be subject to any regulatory

timeframe."  *Id.*  Harvey then submitted additional information in support of her claim, but prior

to Standard reaching a decision, the plaintiff's counsel, also as here, filed an ERISA lawsuit,

arguing that Standard's "failure to provide a decision on her voluntary 'extra-contractual' appeal

should be deemed a denial of her claim," to which the *de novo* standard of review applied.

*Harvey*, 503 Fed. App'x at 847-48.  Judge Hopkins rejected that argument, *see Harvey*, 850 F.

Supp. 2d at 1279-81, and the Eleventh Circuit did likewise, explaining as follows:

> [Harvey] received not only a timely decision on her initial claim (it was denied)
> but also a full administrative appellate review of her claim in accordance with the
> terms of her LTD benefits policy (which upheld the denial of her claim).  At that
> point, Harvey was free to file suit in federal court having exhausted her
> administrative remedies under her LTD benefits policy, yet she requested
> Standard to conduct an additional administrative review of her claim, which
> Standard was not contractually bound, but voluntarily agreed, to do.  Harvey was
> not denied a full and fair administrative review of her claim as her LTD benefits
> policy only required one administrative appeal for purposes of exhaustion and the
> regulations governing voluntary appeals do not provide any time frame for
> decision-making.  Thus, that Harvey chose not to wait for a decision on her
> voluntary appeal but instead filed this suit does not mean that she was denied a
> full and fair administrative review and final decision on her claim.

*Harvey*, 503 Fed. App'x at 848-49.

Harvey also argued that Standard's denial should be deemed unreasonable because

Standard failed to account for evidence produced during the extra-contractual review, including a

favorable Social Security decision, a vocational expert's report, and additional medical records.

17

Judge Hopkins rejected that argument, *see* 850 F. Supp. 2d at 1290-91, and the Eleventh Circuit

did too, stating as follows:

> [T]he district court correctly determined that Standard did not unreasonably
> disregard these documents as they were not submitted to Standard until after it had
> rendered a final decision on her administrative appeal on March 15, 2010.
> Instead, Harvey submitted these documents as part of her subsequent voluntary
> review, on which she chose not to wait for Standard's decision, but instead filed
> this suit on her original claim, which she had a right to do.  Therefore only the
> record before Standard during its consideration of Harvey's initial claim or
> administrative review thereon is relevant.

503 Fed. App'x at 849.  Likewise, on the heels of *Harvey*, a different Eleventh Circuit panel

issued an unpublished opinion affirming Judge Hopkins in another case, rejecting a similar

argument raised by Attorney Allenstein to the effect that ERISA imposes a continuing duty upon

a plan administrator to consider any new evidence that the claimant might submit.  *See McCay v.*

*Drummond Co.*, 823 F. Supp. 2d 1221, 1241-43 (N.D. Ala. 2011), *aff'd*, ___ Fed. App'x ___,

2013 WL 616923, * 4-5 (Feb. 20, 2013).

The court notes that MetLife suggests that the Eleventh Circuit's decision in *Harvey* has

"precedential effect."  (Doc. 31 at 2 n. 1; *see also* Doc. 28 at 5 ("*Harvey* establishes that the

Court *must* apply the Circuit's six-step review process ...." (emphasis added)).  Indeed, even

Plaintiff seems to concede that *Harvey* might represent "the law of the [Eleventh] Circuit."

(Doc. 32 at 1).  However, to the extent that either side assumes that this court is *required* to

follow *Harvey*, that is not the case.  Because the Eleventh Circuit's opinion was not selected for

publication in the Federal Reporter, it is not binding precedent.  *See Suntree Technologies, Inc. v.*

*Ecosense Intern., Inc.*, 693 F.3d 1338, 1349 n. 1 (11th Cir. 2012); *United States v. Wilson*, 2010

WL 2991561, *6 n. 4 (S.D. Fla. 2010); 11TH CIR. R. 36-2.  The same is true of the Eleventh

Circuit's opinion in *McCay*, which is also published only in the Federal Appendix.  And finally, while Judge Hopkins is a member of this court, her decisions in *Harvey* and *McCay* are not binding either.  *See McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004); *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991).  Nonetheless, the undersigned finds the reasoning employed by Judge Hopkins and the Eleventh Circuit in *Harvey* and *McCay* to be persuasive, as further explained below.

As in *Harvey*, the Plan gave Plaintiff the right only to one appeal of the administrator's adverse disability benefits determination.  Plaintiff does not dispute that MetLife provided that appeal and timely resolved it.  Therefore, she cannot plausibly claim that she had a right under the terms of the Plan for any additional administrative review.  Likewise, that single-level review was all that was required to be offered under ERISA.  *See* 29 C.F.R. §§ 2560.503-1(h)(1), (c)(2), (d).  Moreover, for the reasons stated by Judge Hopkins and the Eleventh Circuit in *Harvey* and *McCay*, ERISA also did not impose a continuing duty on the part of MetLife to consider and review whatever additional evidence Plaintiff might furnish after MetLife had timely denied her appeal on January 30, 2009.  *See also Pelletier v. Reliance Standard Life Ins. Co.*, 223 F. Supp. 2d 298, 307 (D. Me. 2002) ("Plaintiff can point to no authority, in either the plan itself or in ERISA, to require Reliance to consider new medical documentation after the denial of her appeal.  Because ... Plaintiff was given a full and fair review before Defendant issued its decision denying Plaintiff's appeal, whatever occurred pursuant to any further gratuitous review undertaken by Defendant will not be considered by this Court."); *Pettaway v. Teachers Ins. & Annuity Ass'n of Amer.*, 644 F.3d 427, 436 (D.C. Cir. 2011) ("[ERISA] regulations provide for the 'opportunity to appeal an adverse benefit determination," 29 C.F.R. § 2560.503-1(h)(1), and

19

not for the opportunity to engage in a continuous cycle of appeals from appeals."). As such, the "courtesy review" that MetLife agreed to provide was "voluntary" not only on the part of the claimant but on the part of the administrator as well. That is, the review was "voluntary" in the sense that a claimant is not required to resort to it under the terms of a plan in order to exhaust administrative remedies. *See* 29 C.F.R. §§ 2560.503-1(c)(2), (c)(3), (d); *Wesson v. Jane Phillips Med. Ctr. & Affiliates Employee Group Healthcare Plan*, 870 F. Supp. 2d 1263, 1272 (N.D. Okla. 2012) ("Reading [29 C.F.R. § 2560.503-1(c)(2) and (c)(3)] in conjunction, one can clearly see that section (c)(3) addresses the reasonableness and delineates the standards for a voluntary appeals process outside the maximum two mandatory appeals allowed under [section (c)(2)]."). Plaintiff was thus free to file suit to challenge MetLife's decision on her "first appeal" if at any point she felt that the "second appeal"/"courtesy review" was taking too long. In addition, as was the case in *Harvey*, the additional review was also "voluntary" in the sense that MetLife agreed to provide it notwithstanding that it was not contemplated under the provisions of the Plan. In other words, MetLife offered the review gratuitously.[10]

While 29 C.F.R. § 2560.503-1(i)(3)(i) establishes time limits on administrative review of a disability claim, those limits do not apply to a "voluntary" procedure that a claimant need not utilize to exhaust administrative remedies. First, that regulation itself states that time limits

---

[10]The court is not suggesting that it believes MetLife was necessarily acting out of purely benevolent motives or that MetLife had *nothing* to gain by agreeing to Plaintiff's request to consider additional evidence. MetLife is a sophisticated party with much experience in ERISA litigation. MetLife was thus likely aware that agreeing to Plaintiff's request to consider additional evidence, even if not legally required, could work to MetLife's advantage if the case were to proceed to litigation. For example, agreeing to such post-appeal review could assist to forestall arguments by Plaintiff that MetLife did not provide "full and fair review" by failing to consider relevant evidence that MetLife's decision to terminate benefits was tainted by a conflict of interest.

apply "whether the plan provides for one or two appeals." 29 C.F.R. § 2560.503-1(i)(3)(i). That language suggests two assumptions: (1) that a plan may provide for no more than two appeals and (2) that the regulation's time limits would then apply to those appeals. And the former is indeed true if one is talking about *mandatory* appeals that a claimant must utilize to exhaust administrative remedies. *See id.*, § 2560.503(c)(2), (d). However, nothing in the regulation precludes a plan from offering more levels of review if those beyond the second are "voluntary," *i.e.*, not required for exhaustion. Second, 29 C.F.R. § 2650.503-1(c)(3) deals with "voluntary" appeals that "a plan offers," but that regulation contains no time limits or any other substantive requirements. *See Harvey*, 850 F. Supp. 2d at 1280; *Harvey*, 503 Fed. App'x at 848; *DaCosta v. Prudential Ins. Co. of Amer.*, 2010 WL 4722393, *4-5 (E.D.N.Y. 2010). Also, no part of 29 C.F.R. § 2560.503-1 expressly contemplates that an administrator might undertake a level of review that is not actually "offered" at all under the written terms of a plan, as occurred both here and in *Harvey*. There is even less reason, therefore, to interpret the regulation as imposing substantive conditions on review that is not only voluntary on the part of the claimant but provided informally and gratuitously as a courtesy to the claimant.

Further, as the *DaCosta* court explained, public policy also supports the position that voluntary appeals are not subject to the same substantive standards as mandatory appeals:

> [A]s a general principle, courts are hesitant to impose additional burdens on a party by virtue of that party voluntarily doing more than the law requires. ... And this principle applies to ERISA. Among other things, ERISA, and the cases interpreting it, seek to "encourage[ ] resolution of benefits disputes through internal administrative proceedings rather than costly litigation." *Conkright v. Frommert*, 130 S.Ct. 1640, 1649 (2010). To that end, it makes no sense to discourage ERISA plan providers from offering voluntary appeals, even if those appeals lack ERISA safeguards. Voluntary appeals provide an additional avenue for insureds to seek relief, before turning to slow and expensive litigation. And,

> because voluntary appeals toll the statute of limitations, they limit the harm that
> unsuccessful appellants might incur in undertaking them

*DaCosta*, 2010 WL 4722393 at *6; *see also Pettaway*, 644 F.3d at 436 (declining to "punish [the

administrator] for voluntarily reopening its administrative review process" where there was

nothing in ERISA that compelled the administrator to do so; "[The administrator] reopened [the

claimant's] review solely to give her an additional opportunity to prove her claim. We cannot

hold that this benevolent act made [the] review any less reasonable, full, or fair."); *see also*

*generally Stiltner v. Beretta USA Corp.*, 74 F.3d 1473, 1482-84 (4th Cir. 1996) (en banc)

(employer's revocation of gratuitous healthcare benefits did not violate ERISA's anti-retaliation

provision); *Thornton v. Graphic Communications Conference of Intern. Broth. of Teamsters*

*Supp. Ret. & Disab. Fund*, 566 F.3d 597 (6th Cir. 2009) (ERISA "does not safeguard 'gratuitous

benefits provided after retirement'" (quoting *Board of Trustees of Sheet Metal Workers' Nat'l*

*Pension Fund v. CIR*, 318 F.3d 599, 604 (4th Cir. 2003)); *Local 6-0682 Intern. Union of Paper v.*

*National Indust. Group Pension Plan*, 342 F.3d 606, 609-10 (6th Cir. 2003) (declining to

recognize a cause of action under ERISA for negligence in making disclosures "offered

gratuitously [by a third-party administrator], out of no obligation either under contract or under

ERISA," with regard to a benefits-amount quotation that turned out to be erroneous); *Beddall v.*

*State Stree Bank & Trust Co.*, 137 F.3d 12, 21 (1st Cir. 1998) ("As a matter of policy and

principle, ERISA does not impose Good Samaritan liability.  A financial institution cannot be

deemed to have volunteered itself as a fiduciary simply because it undertakes reporting

responsibilities that exceed its official mandate.").

    While the court finds *Harvey* persuasive as it relates to the inapplicability of the

regulation's time limit for a gratuitous courtesy review, Plaintiff argues that the facts of her case are distinguishable and still call for *de novo* review of the constructive denial of her "second appeal."[11]  First, Plaintiff offers that her case is different because she initially received LTD benefits which were later terminated while Harvey initially received short-term disability benefits and never received LTD benefits.  (Doc. 30 at 3, ¶ 4).  However, Plaintiff offers no hint for why such a distinction might be material to the analysis.  The court concludes that it is not.

Plaintiff also points out that in *Harvey*, when Standard stated that it would consider additional evidence following the denial of the appeal, Standard expressly advised Harvey that such review would not be governed by the regulations establishing time limits for ERISA appeals.  (*Id.* at 3, ¶ 2).  Plaintiff emphasizes that MetLife's letter to her counsel dated June 16, 2009 contained no such disclaimer and instead "committed to allow a second appeal without reservation."  (*Id.*)  However, neither Judge Hopkins nor the Eleventh Circuit suggested in *Harvey* that whether Standard had stated that it considered additional review to be exempt from the ERISA regulation limiting the time for appeals was a touchstone for either the scope or standard of judicial review.  Rather, the salient point was that the regulation establishing time limits for mandatory appeals did not apply because Standard's additional review was afforded voluntarily and gratuitously as a courtesy to the claimant.  That is likewise the situation here. This argument is without merit.

Finally, Plaintiff falls back to the position that, even if *Harvey* dooms her argument that

---

[11]Plaintiff's counsel has emphasized that he filed a petition for rehearing in *Harvey*. (Doc. 30 at 1-2; Doc. 30-1).  However, the Eleventh Circuit has denied that petition.  *Harvey*, No. 12-11978 (11th Cir. March 8, 2013).  The Eleventh Circuit has likewise denied counsel's petition for rehearing in *McCay*.  *McCay*, No. 12-12149 (11th Cir. April 30, 2013).

23

the time limits of 29 C.F.R. § 2560.503-1(i)(3)(i) applied to her "second appeal," that appeal was still "deemed denied" on the theory that MetLife was required, Plaintiff says, to decide it within a "reasonable time." (Doc. 30 at 3-4, ¶ 5; *id.* at 5, ¶ 6). She adds that, even if the regulation does not actually control, the court might still consider its 90-day limitation on review "as a guide to what is reasonable." (Doc. 30 at 3-4, ¶ 5). However, Plaintiff fails to set forth a basis for imposing even a "reasonable time" restriction on MetLife's courtesy review.[12] Again, Plaintiff had no right under the Plan or ERISA to further administrative review once MetLife denied her appeal on January 30, 2009. Plaintiff had exhausted her administrative remedies at that point, and MetLife advised her that she could file suit at any time to challenge the denial. The court fails to see why MetLife should be saddled with an enforceable legal duty to complete its additional review within any particular time period, under the regulation or otherwise, given that (1) MetLife had no obligation to provide additional review in the first place and (2) Plaintiff was on notice that she could abandon the "second appeal"/"courtesy review" and file suit whenever she saw fit. Plaintiff's argument on this point is due to be rejected.

Based on *Harvey*, *McCay,* and the foregoing discussion, the court concludes as follows: First, the court's review is limited to consideration of MetLife's decision on January 30, 2009, to deny Plaintiff's administrative appeal. Second, the court's review is limited to the materials that were before MetLife at the time it issued that denial. And third, Plaintiff is not entitled to *de novo* review based upon MetLife's failure thereafter to resolve Plaintiff's would-be "second

---

[12]The court would note that the regulation's temporal restriction *actually is* a requirement that review be completed within a "reasonable period of time"; the two 45-day periods allowed under the regulation operate as a qualifying outer limit on what is "reasonable." 29 C.F.R. §§ 2560.503-1(i)(1)(i), (i)(3)(i).

appeal" prior to suit being filed.   As a result, Plaintiff's motion for partial summary judgment arguing for such a *de novo* review and for consideration of all materials submitted to MetLife up to the filing of the lawsuit (Doc. 14) is due to be denied.

### B.    Alleged Failure to Give Notice of Additional Information Needed

Before addressing the substance of MetLife's denial of Plaintiff's appeal, the court will first briefly address Plaintiff's argument she was denied a full and fair review stemming from an alleged procedural deficiency.  Specifically, Plaintiff argues that MetLife failed to comply with 29 C.F.R. § 2560.503-1(g)(1)(iii), which requires a notice of an adverse benefit determination to include, "in a manner calculated to be understood by the claimant," a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."  Plaintiff claims that MetLife's terminated notice dated November 6, 2008, failed to include such a description, thereby preventing her from submitting the necessary information on her administrative appeal.  The court disagrees.

The Eleventh Circuit requires only that a notice of an adverse benefits determination "substantially comply" with the content requirements set forth in the regulation.  *See Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1317-18 (11th Cir. 2000); *Counts v. American Gen. Life Ins. Co.*, 111 F.3d 105, 107 (11th Cir. 1997); *Acree v. Hartford Life & Acc. Ins. Co.*, ___ F. Supp. 2d ___, ___, 2013 WL 140097, *16 (M.D. Ga. 2013); *Schwade v. Total Plastics, Inc.*, 837 F. Supp. 2d 1255, 1268-69 (M.D. Fla. 2011).  In this context, "substantial compliance" means that the notice must be reasonably calculated to afford the claimant with a sufficiently clear understanding of the administrator's position and what additional materials to provide in

order for the appeals process to prove effective.  *See Bojorquez v. E.F. Johnson Co.*, 315 F. Supp. 2d 1368, 1373 (S.D. Fla. 2004); *Acree, supra,* at *16.

MetLife's notice advising Plaintiff that her LTD benefits were being discontinued complied with the notice requirements of 29 C.F.R. § 2560.503-1(g), including specifically subsection (g)(1)(iii).  After reviewing the definitions of "disability" under the Plan, MetLife's three-page, single spaced notice letter reviewed in detail MetLife's assessment of Plaintiff's recent medical records that had been obtained from Drs. Just and Ray and why MetLife considered them not to support physical or psychiatric impairments precluding Plaintiff from performing her job as a claims specialist.  (949-50).  Turning to what additional materials would be required if Plaintiff desired to appeal, the notice continued:

> If you wish to further pursue your LTD claim the following information is needed to review from Dr. Ray; Current psychiatric evaluation, office visit notes, medical records, and/or testing which documents an impairment in functional abilities that would prevent you from performing the essential duties of your occupation. Medical information needed from Dr. Just; Abnormal examination, diagnostic testing to confirm a severity of impairments, current functional capabilities and restrictions and limitations, an updated treatment plan and certification of disability.

(951).  Such a description is at least as complete and understandable as other notices that courts in this circuit have found substantially compliant with the regulation.  *See Moeller v. Guardian Life Ins. Co. of Amer.*, 2011 WL 7981954, *11 (M.D. Fla. 2011); *Cook v. Standard Ins. Co.*, 2010 WL 807443, *18 (M.D. Fla. 2010); *Bojorquez*, 315 F. Supp. 2d at 1373-74; This claim is without merit.

### C.     Review of the Denial of Plaintiff's Administrative Appeal

Under *Williams*, the court is first to consider whether MetLife's denial of Plaintiff's

appeal of the termination of her LTD benefits was "wrong" under a *de novo* standard of review

that grants no deference to the administrator's decision.  *See Blankenship*, 644 F.3d at 1355;

*Williams*, 373 F.3d at 1137-38.  It is undisputed that the Plan granted MetLife discretionary

authority.  Accordingly, the court must ask whether it would have reached the same decision as

the administrator if the court were deciding the matter in the first place, based on the record that

was before the administrator at the time of its decision, here made on January 30, 2009.  *See*

*Capone*, 592 F.3d at 1196; *Glazer*, 524 F.3d at 1246-47; *see also Gipson v. Administrative*

*Committee of Delta Air Lines, Inc.*, 350 Fed. App'x 389, 394 (11th Cir. 2009); *Reeve v. Unum*

*Life Ins. Co. of Amer.*, 170 Fed. App'x 108, 111-12 (11th Cir. 2006); *Bates v. Metropolitan Life*

*Ins. Co.*, 2009 WL 2355834, *2-3 (M.D. Ga. 2009); *Anderson v. Unum Life Ins. Co. of Amer.*,

414 F. Supp. 2d 1079, 1101-02 (M.D. Ala. 2006).  The burden to show continued entitlement to

benefits ultimately rests with Plaintiff even though MetLife initially granted her a period of LTD

benefits before terminating them.  *See Ruple v. Hartford Life & Acc. Ins. Co.*, 340 Fed. App'x

604, 613 (11th Cir. 2009); *Cosgrove v. Raytheon Co. Long Term Disability Plan*, 277 Fed.

App'x 879, 880 (11th Cir. 2008).

## 1.    The Social Security Award

One of Plaintiff's primary arguments is that MetLife's decision was at least *de novo*

wrong based on the theory that MetLife failed to give proper consideration to her Social Security

disability award.  Plaintiff admits that the Social Security decision is not binding in determining

eligibility for disability benefits under the Plan.  Plaintiff also ultimately concedes that MetLife

"mentioned the SSA decision" in its notice to Plaintiff that her administrative appeal was denied.

(Doc. 25 at 21; *see also* (825)).  Plaintiff maintains, however, that MetLife "never attempted to

distinguish the SSA decision."  (Doc. 25 at 21).

Plaintiff is correct that approval of Social Security disability benefits is not dispositive of whether a claimant satisfies the requirement for disability under an ERISA plan.  *Whatley v. CNA Ins. Companies*, 189 F.3d 1310, 1314 n. 8 (11th Cir. 1999); *Ray v. Sun Life & Health Ins. Co.*, 443 Fed. App'x 529, 533 (11th Cir. 2011).  Indeed, while the SSA's determination may be relevant, *see Glenn v. MetLife*, 461 F.3d 660, 667 (6th Cir. 2006), *aff'd* 554 U.S. 105 (2008); *Wilson v. Walgreen Income Protection Plan for Pharmacists*, __ F. Supp. 2d ___, ___, 2013 WL 1799599, *34 (M.D. Fla. 2013), it is not entitled to any particular deference or weight.  *See Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465, 471 n. 3 (5th Cir. 2010); *Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010); *cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (holding that, unlike in cases reviewing the denial of disability benefits under the Social Security Act, courts reviewing denials of disability benefits under ERISA "have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's [treating] physician.").  That is so for several reasons. First, the standards and procedures that the SSA employs in determining eligibility for disability benefits under the Social Security Act are distinct and may differ considerably from those used to determine whether a claimant is entitled to disability benefits under the terms of an ERISA plan. *See Nord*, 538 U.S. at 832-33; *Krolnik v. Prudential Ins. Co. of Amer.*, 570 F.3d 841, 844 (7th Cir. 2009); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442-43 (2d Cir. 2006); *Smith v. Continental Cas. Co.*, 369 F.3d 412, 419-20 (4th Cir. 2004).  Likewise, the ERISA plan administrator may have considered more recent or different information or weighed evidence differently.  *See Ray*, 443 Fed. App'x at 533; *Schexnayder*, 600 F.3d at 471; *Wade v. Aetna Life*

28

*Ins. Co.*, 684 F.3d 1360, 1362-63 (8th Cir. 2012).  It is also possible, of course, that the SSA's

decision may have itself simply been wrong.  *See Glenn*, 554 U.S. at 134 (Scalia, J., dissenting).

It should be noted, however, that the Social Security definition of "disability" is narrower

than the Plan's definition of that term as it applied to Plaintiff's LTD benefits claim.  In order to

be disabled for purposes of Social Security, a claimant must establish that she suffers from a

mental or physical impairment of such severity that, in light of her age, education, and work

experience, she is prevented from engaging "in any ... kind of substantial gainful work that exists

in the national economy."  42 U.S.C. § 423(d)(2)(A); *see also id.*, § 423(a)(1), (d); *Cleveland v.*

*Policy Management Systems Corp.*, 526 U.S. 795, 801 (1999).  By contrast, in order to show she

was disabled under the Plan when MetLife terminated her benefits, Plaintiff was required to

show only that she was "unable to earn more than 80% of [her] Pre-disability Earnings ... at [her]

Own Occupation from any employer in [her] Local Economy."  (31).  On its face, the Social

Security definition presents a materially more difficult threshold for a claimant to meet.  *See, e.g.,*

*Donaho v. FMC Corp.*, 74 F.3d 894, 901 n. 13 (8th Cir. 1996) (recognizing that the SSA's

determination that the claimant could perform the duties of a "data entry operator ... does not

support" that she could perform her prior job as a "computer software engineer, a very

demanding occupation"), *abrogated on other grounds by Nord*, *supra*.  Accordingly, that the

SSA granted disability under a standard stricter than that applicable under the Plan is a point in

Plaintiff's favor.

That being said, the *only* information in the record relating to Plaintiff's Social Security

award is the bare fact that, in March 2008, the SSA awarded monthly benefits in an enumerated

amount, retroactive to the preceding month.  Notably absent is an opinion of an administrative

law judge ("ALJ") or other documentation elucidating the rationale for the SSA's conclusion. Nor does the record show even what materials the SSA considered.  Thus, while the fact that the SSA awarded benefits in March 2008 accounts for *something*, standing alone, it has limited probative value as it relates to Plaintiff's eligibility for LTD benefits under the Plan past November 6, 2008.  *Cf. Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1280 n. 2, 1281, 1286 (11th Cir. 2003) (in holding that the district court erred in awarding ERISA benefits based in part upon its consideration of a Social Security award, the Eleventh Circuit noted, "Besides a letter from the [SSA] confirming that Shaw had been approved for Social Security benefits, no documentation (particularly documentation indicating the basis upon which the approval was granted) from the [SSA] has been entered into the record."); *Ianniello v. Hartford Life & Acc. Ins. Co.*, __ Fed. App'x ___, ___, 2013 WL 262235, *2 (2d Cir. 2013) ("In this case the SSA award bears even less on whether Hartford abused its discretion, because the only document Ianniello provided Hartford was a letter from the SSA confirming the amount of disability benefits she received each month. Ianniello has identified no documents that reveal the basis for the SSA's determination.").

## 2.    Records and Opinions of Healthcare Providers

Plaintiff also relies on records of her treating doctors to demonstrate that MetLife's decision that she was able to perform her own occupation past November 6, 2008, was *de novo* wrong.  In examining that argument, the court will first focus upon whether the evidence before MetLife as of January 30, 2009, established that Plaintiff was suffering from a neurological or other physical impairment that prevented her from performing her job duties past the relevant date.  The court will then consider whether that evidence established that Plaintiff was suffering

from a mental impairment that rendered her disabled under that same standard.

Plaintiff underwent MRI testing of her head and full spine in August 2007.  (688-691; 1143-44).  The spinal MRI revealed a "very small protrusion" at C4-5 to the right of the midline, a "mild right paracentral disk bulge" at T2-3, and a "minimal broad-based disk bulge" at L2-3. (*Id.*)  However, those results were interpreted as relatively mild degenerative changes (*id.*), and Plaintiff points to no physician who suggested that back problems prevented her from working.

The contemporaneous MRI of Plaintiff's head showed a small, nonspecific area of increased signal in the right frontal lobe of the brain.  (688).  Despite that irregularity, Dr. Carol L. Pappas, a consulting neurologist in Florida who saw Plaintiff twice in the fall of 2007 expressed doubts as to the existence of a physical pathology for Plaintiff's "multiple medical complaints" in light of her "normal neurological exam."  (1134).  In fact, Dr. Pappas went so far as to offer at least a tentative diagnosis of "factitious disorder," thereby suggesting a belief that Plaintiff might have been feigning her symptoms for sympathy.  (*Id.*); *see also* Diagnostic Codes 300.16, 300.19, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. text rev. 2000) (hereinafter "DSM-IV-TR").  In any event, Dr. Pappas unequivocally stated that Plaintiff "does not have a neurologic disability."  (1134).

Soon after that, Plaintiff moved to Gadsden, Alabama and began seeing another neurologist, Dr. Just.  Plaintiff relies upon Dr. Just's records as supporting her claim.  (Doc. 30 at 5-6).  However, those materials, documenting about ten treatment visits between November 2007 and October 2008 (*see* 953, 958-63, 1013-16, 1069-75), do not aid Plaintiff's cause.  To the contrary, while Dr. Just acknowledged Plaintiff's subjective complaints of "vague symptoms of generalized depression and chronic pain, memory loss and syncope" (959), he stated that these

31

were "difficult to reconcile anatomically" (963), that he found "no medical cause" for them (960), and that he could offer no "definitive diagnosis." (1070). Specifically, Dr. Just's notes show that he consistently found Plaintiff to present normally upon physical examination (958-63, 1069-75, 1011-14), and he interpreted Plaintiff's August 2007 MRI's as showing "no diagnostic pathology." (1075). Based on Plaintiff's complaints, Dr. Just had her undergo another brain MRI in January 2008, but it too was deemed essentially unremarkable, both by the reviewing radiologist (1020) and by Dr. Just (1013). In July 2008, Dr. Just also ordered a 24-hour ambulatory EEG test, during which time, however, he noted, Plaintiff was "asymptomatic." (958). Dr. Just also found that a Holter monitor test administered at that same time was "likewise nondiagnostic." (*Id.*) In an attending physician statement dated October 3, 2008, Dr. Just stated that his treatment plan was simply for Plaintiff to continue with psychotherapy, as he had previously opined that "psychiatric factors" were likely "affecting [Plaintiff's] symptomology" (959), and to set up a cardiology consult. (955). Dr. Just also checked a box on the form indicating that he had never advised Plaintiff to cease work. (956). Finally, Dr. Phillips, a physician retained by MetLife to review Plaintiff's medical records, advised MetLife that when she spoke to Dr. Just by phone in January 2009, she stated her belief that Plaintiff did not have functional limitations that would preclude her from returning to work, and Dr. Just "did not disagree."[13] (931). Dr. Just's records do not support that MetLife's decision was wrong.

_____

[13]Plaintiff contends that MetLife acted improperly in relying upon or otherwise considering Dr. Phillips's statement in her report that Dr. Just "did not disagree" when Dr. Phillips opined that Plaintiff did not have functional limitations that prevented her from returning to work. (*See* Doc. 19 at 24, 27-28; Doc. 25 at 23; Doc. 30 at 6). To the extent that Plaintiff is arguing that Dr. Phillips's statement regarding her conversation with Dr. Just could not be considered by MetLife or cannot be considered by the court, Plaintiff is incorrect. This court's review includes materials that were before the plan administrator at the time of its decision, even

Plaintiff also points to records from her regular physician, Dr. Hershad Patel, an internist. (Doc. 30 at 6, ¶ 4, citing (768-81)).  Among such records highlighted by Plaintiff is a physician statement dated May 15, 2008, in which Dr. Patel indicated that Plaintiff has fibromyalgia, degenerative joint disease, osteoarthritis, "some depressive disorder," and a "[history] of neuropathy."  (768).  However, those records from Dr. Patel, like many of the others that Plaintiff relied upon in her initial briefs, were not furnished to MetLife until well after MetLife denied Plaintiff's administrative appeal on January 30, 2009.  (*See* 755).  As such, they are outside the scope of the court's review for reasons previously explained.

Even if Dr. Patel's cited records are considered, however, they fail to show that MetLife's decision was wrong.  Many of the records relate to treatment in 2001 and 2002.  (760-763, 774-76).  That was years before August 2007, when Plaintiff last worked, so those records lack probative force as it relates to whether Plaintiff could perform her job after November 6, 2008.  But even assuming the validity of the diagnoses listed by Dr. Patel on his records from the 2007-2008 time period (*see* 756-59, 768-73, 778-80), the fact he noted the existence of certain conditions does not show that he believed they resulted in functional limitations that prevented Plaintiff from performing her job.  *Cf. Jones v. Astrue*, 2012 WL 5379142, *3 (N.D. Ala. 2012) (noting in the Social Security context that "more important than the name or diagnosis given to a

---

if they would be hearsay under the Federal Rules of Evidence.  *See Herman v. Hartford Life & Acc. Ins. Co.*, ___ Fed. App'x ___, ___, 2013 WL 530836, *4 (11th Cir. Feb. 13, 2013) (citing *Black v. Long Term Disability Ins.*, 582 F.3d 738, 746 n. 3 (7th Cir. 2009)); *Huffstutler v. Goodyear Tire & Rubber Co.*, 2012 WL 4344735, *13 (N.D. Ala. Sept. 17, 2012).  Furthermore, Dr. Phillips statement that Dr. Just "did not disagree" when she suggested that Plaintiff was not disabled appears to be sufficiently reliable insofar as Dr. Just had both (1) indicated in his October 3, 2008, physician statement that he had not advised Plaintiff to stop working and (2) documented his inability to objectively verify Plaintiff's symptoms or a medical cause for them.

particular impairment is the question of the extent to which the claimant's impairments limited her ability to work") (citing *Gainous v. Astrue*, 402 Fed. App'x 472, 475 (11th Cir. 2010); *Robinson v. Astrue*, 365 Fed. App'x 993, 995 (11th Cir. 2010)).  Nowhere in those cited records does Dr. Patel assign functional limitations or assert that Plaintiff was unable to work, at her prior job or any other, because of fibromyalgia or another other condition.  Indeed, Dr. Patel had diagnosed Plaintiff with fibromyalgia by at least June 2002 (760), but it is undisputed that she worked regularly as a claims specialist for years after that.  Likewise, in the May 2008 physician statement, completed by Dr. Patel to support Plaintiff's application to be an adoptive or foster parent, Dr. Patel generally described Plaintiff's health as normal and certified that she was "medically and physically able to take care of [a] child," despite the conditions he diagnosed. (768-69; *see also* 779, 780 (indicating normal physical exam findings in both December 2007 and March 2008)).  It might be conceded that having the ability to take care of even a young a child does not necessarily mean that a claimant can work.  *See Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005).  Nonetheless, the associated tasks and responsibilities of childcare may be physically and emotionally demanding.  *Cf. Williams*, 373 F.3d at 1139 (recognizing that claimant's testimony supported that she was not disabled where she acknowledged "engaging normally in the significant activities of daily living, including caring for two young children and a granddaughter ....").  Dr. Patel's unqualified affirmation of Plaintiff's parenting capacity tends to undercut that he believed that the conditions he diagnosed resulted in substantial limitations.

While the evidence before MetLife when it denied Plaintiff's appeal does not show that MetLife was wrong to discount the existence of a disabling *physical* impairment, a closer question is presented as to whether MetLife was wrong also to determine that Plaintiff did not

have a *mental* impairment that prevented her from working at her own occupation after

November 6, 2008.  In particular, it is undisputed that MetLife had deemed Plaintiff's medical

records sufficient in both January 2008 and again in May 2008 to establish her eligibility for LTD

benefits under the Plan based upon a mental impairment.  Further, the records of Dr. Ray, the

psychologist who appears to have been the only provider treating Plaintiff regularly for mental

issues in the period leading up to the discontinuation of benefits, support that he consistently

opined that Plaintiff was unable to work, as explained below.

When Dr. Ray first saw Plaintiff in late November 2007, he offered an "initial

impression" of depression with an associated thought disorder, along with a "tentative diagnosis"

of bipolar type II disorder, not otherwise specified, corresponding to DSM-IV-TR code 296.8.[14]

(1076).  Dr. Ray further indicated that Plaintiff had "severe limitations" stemming from

"significant loss of psychological, physiological, personal and social adjustment" and that she

was "not stable at present," such that for an indefinite period she would be unable to work.

(1111).

Plaintiff's next visit with Dr. Ray documented in the records was on April 22, 2008, at

which time he administered a mental status exam (1003) and noted that Plaintiff had self-

identified the cause of "her episodes" to be exposure to otherwise unidentified "chemicals."

(1004).  By the time he saw Plaintiff again on May 14, 2008, Dr. Ray's primary diagnosis for

Plaintiff had shifted to bipolar type I disorder, with a most recent episode depressed, moderate,

DSM-IV-TR code 296.52 (997, 1005), with an Axis II diagnosis of a pain disorder related to

---

[14]The court notes that a diagnosis of bipolar disorder, if credited and found to be
otherwise disabling, would appear potentially to have brought Plaintiff within an exception to the
Plan's 24-month maximum limitation on LTD benefits for mental disorders.  *See* (39).

35

psychological factors, code 307.89.  (997).  Dr. Ray's office visit note, however, also

documented overall "improvement," with "good mood," increased "mentation," and a decreased

frequency of "episodes."  (1005).  Nonetheless, on a form completed the next day, May 15, 2008,

Dr. Ray still assigned a Global Assessment of Functioning ("GAF") rating of "45-50," indicating

"serious" impairment of functioning, *see McCloud v. Barnhart*, 166 Fed. App'x 410, 418 (11th

Cir. 2006), along with a GAF rating of "65" as being the highest in the preceding year.  (997).

He further explained that Plaintiff's "condition remains unstable to [the] point of not being able

to concentrate and [to cause changes in] mood," that she "passes out due to [a] neurological

condition," and that her "mood [and] mentation [are] very unstable and unpredictable."  (998).

Dr. Ray again recommended that Plaintiff remain off work indefinitely, and he advised that he

planned to keep seeing Plaintiff every two to three weeks or as needed.  (997, 1001).

　　　　Plaintiff's next visit with Dr. Ray documented in the records was August 28, 2008.  (980-

81).  On a disability assessment questionnaire dated that day, Dr. Ray repeated his prior

diagnoses of bipolar disorder type I and a pain disorder related to psychological factors, adding

that Plaintiff was also suffering from "fibromyalgia, pain, [and a] neurological [disorder]."

(980).  While stating that Plaintiff had no suicidal or homicidal ideations or history of substance

abuse, he noted Plaintiff's complaints of "pain numbness, tingling, weakness, passing out spells,

[and decreased] mentation, ... memory, [and] concentration."  (980-81).  When asked what

specific symptoms or limitations would impair Plaintiff's ability to work, Dr. Ray answered that

Plaintiff "can not predict when she is going to have a passing out spell" and he highlighted that

Dr. Just had "suspended" Plaintiff from driving.  (980).  Dr. Ray also stated that he had made no

referrals but planned to see Plaintiff on a monthly basis or as needed.  (980-81).

36

Dr. Ray's last record in the file dated before MetLife's termination of LTD benefits and subsequent appeal is an office visit note for September 17, 2008.  (978).  Dr. Ray again noted Plaintiff's complaints of generalized pain and continued "fainting spells ... [without] warning."  (978).  However, Dr. Ray wrote that Plaintiff's mental status exam was "ok," he related the absence of suicidal or homicidal ideations, no headaches or drug abuse, and that Plaintiff was fully oriented.  (*Id*.)   He also indicated that Plaintiff's "mood [and] mentation" were stable.  (*Id*.)  He concluded by stating that he planned to see Plaintiff again in four weeks to "continue to assess and eval[uate the] nature of [Plaintiff's] problems."  (*Id*.)

MetLife highlights that when asked on the August 28, 2008 questionnaire whether he had "recommend[ed that his] client stop working," Dr. Ray checked the box for "no."  (980).  MetLife argues that Dr. Ray thereby communicated a belief that Plaintiff had become able to work by that time.  (*See* Doc. 24 at 8, ¶ 20; *id.* at 22).   But viewed in their entirety and in context, the court finds that Dr. Ray's earlier records and his responses on the August 2008 questionnaire show that he continued to believe that Plaintiff was *not* able to work.  First, despite checking the "no" box adjacent to the question about whether he had recommended that Plaintiff stop working, it is undisputed that Dr. Ray had indicated on similar forms in both November 2007 and May 2008, that Plaintiff should be off work.  (*See* 997, 1001, 1111).  Second, just as he had in May 2008, Dr. Ray wrote on the August 2008 form that Plaintiff had a current GAF score of 45, corresponding to seriously impaired functioning.  Third, immediately below where he checked the "no" box on the August 2008 form, Dr. Ray was asked, "if" he had answered "yes" to the question about whether he had recommended that the client stop working, to specify the date of such recommendation.  (980).  On the response line for that question, Dr. Ray wrote "unknown."

37

(*Id*.)  That suggests Dr. Ray understood that he had, in fact, previously recommended that

Plaintiff stop working but was unsure when he had done so.  Finally, on the next page of the

questionnaire, when asked to provide an "estimated return to work (RTW) date," Dr. Ray wrote:

"RTW is undetermined."  (981).  Such a statement is inconsistent with an opinion that Plaintiff

was able to work at that very time.  In light of the above, the court has no serious doubt that Dr.

Ray either (1) mistakenly checked the "no" box instead of the "yes" box when he was asked

whether he had recommended that Plaintiff stop working or (2) that he misread the question as

asking for his opinion on whether Plaintiff was then able to work.  Either way, the court finds

that, despite some ambiguity, Dr. Ray's records before MetLife showed clearly enough that, as of

August 28, 2008, he was still of the opinion that Plaintiff could not work.[15]

Even assuming, however, that Dr. Ray indicated a belief that Plaintiff remained unable to

work, Dr. Ray's records do not show that MetLife's determination on appeal that Plaintiff was

not disabled under the Plan was *de novo* wrong.  As recognized in the report of consulting

psychiatrist Dr. Becker, Dr. Ray's last progress note considered by MetLife, from September 17,

2008, showed no specific bipolar symptoms that were targeted for treatment, nor did that note

indicate significant abnormalities or impairments due to severe psychiatric symptoms.  (874,

---

[15]The court's interpretation of the August 2008 form as indicating that Dr. Ray continued to believe that Plaintiff could not work is also confirmed to be correct by a Social Security Disability Questionnaire that Dr. Ray completed on July 28, 2009.  (814-15).  In particular, Dr. Ray indicated on the July 2009 form that he was of the opinion both (1) that Plaintiff was unable to perform any gainful employment and (2) that such had been the case since prior to Dr. Ray's initial session with Plaintiff in November 2007.  (814).  Strictly speaking, the July 2009 questionnaire is outside the scope of the court's *de novo* review because it was not supplied to MetLife until some six months after the denial of Plaintiff's administrative appeal on January 30, 2009.  (813).  Even without the July 2009 form, however, the court concludes that the evidence discussed in the text sufficiently established that Dr. Ray still believed at the end of August 2008 that Plaintiff was unable to work.

978).  Instead, that progress note documented that Plaintiff's mental status was "ok" and indicated that her "mood" and "mentation" were stable.  (874, 978).  The last progress note in the record before that, from May 15, 2008, similarly stated that Plaintiff reported a decreased frequency of "episodes," "good mood," increased "mentation," and overall "improvement." (1005).  It is true that the note from September 17th did state that Plaintiff "continued to have fainting spells ... without warning" and that she was still having pain at a level of 4-8 on a scale of zero to 10.  (978).  And Dr. Ray's August 28, 2008 questionnaire form also referenced "pain, numbness, tingling, weakness, [unpredictable] passing out spells," and decreased "mentation," memory, and concentration.  (980).  However, as discussed above, Dr. Just had interpreted Plaintiff's numerous labs and diagnostic tests as failing to evidence a medical impairment, he repeatedly documented normal physical and neurological exams, and he declined to diagnose a physical impairment or certify a disability.  Likewise, Dr. Ray's records do not provide objective findings or qualitative or quantitative testing or discussions regarding Plaintiff's symptoms or their limiting effects.  As such, the recitals of symptoms in Dr. Ray's later records appear to be little more than a list of Plaintiff's history of subjective complaints generally.  Moreover, it would seem that Dr. Ray's opinion that Plaintiff could not work was based in material part on his inclination to credit Plaintiff's assertion that she was suffering from an unspecified neurological disorder or some other physical problem.  *See* (978) (speculating that Plaintiff might be suffering from "heavy metal poisoning" or a problem with her "trigeminal nerve"); (980, 997) (noting that Plaintiff suffers from a "neurological [disorder]"; (1005) (warning Plaintiff "to stay away from chemicals that cause episodes," based on Plaintiff's self-diagnosis); (1076) (offering to Dr. Just that Plaintiff may be suffering from MS, "bulging or herniated" discs, and "seizures").  As a

licensed psychologist, though, Dr. Ray lacked the qualifications to render any such medical diagnoses reliable, particularly in light of Dr. Just's records.

As also highlighted by Dr. Becker, by August and September 2008, Dr. Ray's treatment plan for Plaintiff was generally inconsistent with the proposition that she was suffering from a "severely impairing psychiatric condition." (874). By that time, Dr. Ray recommended that Plaintiff need be seen for psychological counseling only once per month, with a conservative course of medication, and no referrals planned for psychiatric evaluation or follow up. (874, 978, 980). Dr. Becker suggested, however, that if Plaintiff's impairments were truly severe, one would typically expect that "intensive psychotherapy such as on a weekly basis or involvement in an intensive outpatient program or partial hospitalization program would be utilized." (874); *also cf. Rothgeb v. Astrue*, 2012 WL 3611281, *9 (M.D. Ala. Aug. 21, 2012) (upholding finding that Social Security claimant was not suffering from disabling psychological impairment where ALJ found that claimant's overall level of psychiatric care, which involved "routine treatment once a month," was "inconsistent with the level of treatment one would expect for a patient whose symptoms were as severe as [the claimant's] allegedly were").

For the foregoing reasons, MetLife's denial of Plaintiff's appeal on January 30, 2009 was *de novo* correct, based on the record materials then before MetLife. Generally speaking, once the district court reaches such a conclusion, it would be appropriate simply to enter judgment in favor of the plan administrator and against the claimant. *See Williams*, 373 F.3d at 1138. The court determines, however, that before it may do so in this case, it is necessary to address Plaintiff's pending motion for remand. (Doc. 29). Specifically, Plaintiff there argues that, even if MetLife's denial of her appeal in January 2009 is otherwise due to be affirmed in light of the

materials then before MetLife, the court must remand for further administrative proceedings.

Accordingly, the court now turns to that final issue.[16]

### D.     Plaintiff's Motion for Remand

In her motion for remand, Plaintiff insists that she will be denied a full and fair review of her claim as mandated by ERISA unless the court sends the case back to MetLife to rule upon her claim for LTD benefits in light of all of the evidence she submitted between the denial of her appeal in January 2009 and the filing of suit.  However, the Eleventh Circuit panel in *Harvey* rejected the same argument.  Again, that court stated:

---

[16]The court would also acknowledge that Plaintiff has a pending motion for discovery. (Doc. 15).  However, Plaintiff has not made a proper motion or showing that such discovery is required in order for her to oppose MetLife's motion for summary judgment.  *See* FED. R. CIV. P. 56(d).  Furthermore, the court concludes that Plaintiff is not entitled to such discovery given the context in which the court has resolved MetLife's dispositive motion.  Plaintiff's motion for discovery focuses on evidence relating to the alleged "bias" and "conflict of interest" of both MetLife and the consulting physicians it retained to review Plaintiff's medical records on her administrative appeal. (Doc. 15).  It might be assumed that such discovery may be appropriate where a court must evaluate an ERISA plan administrator's conflict of interest and the extent to which it might have influenced an adverse benefits determination.  *See, e.g., Harvey*, 787 F. Supp. 2d at 1291-92.  However, the court's resolution of MetLife's dispositive motion occurred at the first step of the *Williams* analysis, with a determination that MetLife's rejection of Plaintiff's appeal was *de novo* correct.  In doing so, the court did not afford any deference to MetLife's decision and was limited to the materials before MetLife at the time of its decision. *See Blankenship*, 644 F.3d at 1355; *Williams*, 373 F.3d at 1137-38; *Glazer*, 524 F.3d at 1246-47; *see also Gipson*, 350 Fed. App'x at 394; *Reeve*, 170 Fed. App'x at 111-12; *Bates*, 2009 WL 2355834, *2-3; *Anderson*, 414 F. Supp. 2d at 1101-02.  In that setting, the court is not called upon to weigh MetLife's admitted conflict as both the funder of benefits and adjudicator of claims; that would occur only if necessary at the sixth and final step of the *Williams* analysis, as understood post-*Glenn*.  As such, the information sought by Plaintiff's discovery becomes unnecessary to resolve the case.  *Cf. Eldridge v. Wachovia Corp. LTD Plan*, 2007 WL 117712, *2 (11th Cir. 2007) (district court did not abuse its discretion in denying discovery; discovery was unnecessary because the record was restricted to the evidence that was before the plan administrator); *Pitts v. Bakery & Confectionary Union & Indust. Intern.*, 2013 WL 396272, *4 (M.D. Ga. Jan. 31, 2013) ("Because this is an ERISA action, no discovery took place prior to the parties' summary judgment motions, and the Court decides this case based solely on the administrative record.").

41

Harvey was not denied a full and fair administrative review of her claim as her LTD benefits policy only required one administrative appeal for purposes of exhaustion and the regulations governing voluntary appeals do not provide any time frame for decision-making.  Thus, that Harvey chose not to wait for a decision on her voluntary appeal but instead filed this suit does not mean that she was denied a full and fair administrative review and final decision on her claim.

*Harvey*, 503 Fed. App'x at 848-49.  Plaintiff fails to offer a convincing argument that her case is distinguishable.

As the court has previously explained, the Plan gave Plaintiff only one appeal of MetLife's adverse benefits determination, and that review was all that was required under ERISA as well.  *See* 29 C.F.R. §§ 2560.503-1(h)(1), (c)(2), (d).  *That* appeal was when Plaintiff had both the right and the opportunity to furnish whatever evidence she desired to support her claim.[17] While Plaintiff concedes that MetLife provided that appeal, she urges that ERISA also imposes a continuing duty on MetLife to consider all of the additional evidence she later furnished. However, the Eleventh Circuit recently found "no merit to [the claimant's] argument that he has an unlimited right to submit additional evidence of disability" and reiterated that judicial review is limited to the materials that were before the plan administrator at the time of its final decision. *McCay*, 2013 WL 616923 at *4; *see also Harvey*, 503 Fed. App'x at 849; *Pelletier*, 223 F. Supp. 2d at 307 ("Plaintiff can point to no authority, in either the plan itself or in ERISA, to require Reliance to consider new medical documentation after the denial of her appeal.  Because ... Plaintiff was given a full and fair review before Defendant issued its decision denying Plaintiff's appeal, whatever occurred pursuant to any further gratuitous review undertaken by Defendant

---

[17]The court expresses no opinion on whether Plaintiff might be entitled to file another application for LTD benefits under the Plan or, if she were to do so, how the additional evidence she submitted after the denial of her appeal might impact a disability determination by MetLife.

will not be considered by this Court."); *Pettaway*, 644 F.3d at 436 ("[ERISA] regulations provide for the 'opportunity to appeal an adverse benefit determination," 29 C.F.R. § 2560.503-1(h)(1), and not for the opportunity to engage in a continuous cycle of appeals from appeals.").  In essence, Plaintiff's motion for remand seeks to have the court order MetLife to reconsider Plaintiff's claim in light of the evidence that she failed to timely submit and which MetLife had no legal obligation to consider, under either the terms of the Plan or ERISA itself.  The court declines to do so.  Accordingly, Plaintiff's motion to remand (Doc. 29) is due to be denied.

IV.    **CONCLUSION**

Based on the foregoing, the court concludes as follows:  MetLife's motion for judgment as a matter of law (Doc. 23) is due to be **GRANTED**, while Plaintiff's motions for partial summary judgment, on the standard and scope of review (Doc. 14); for discovery (Doc. 15); "for judgment on liability" (Doc. 18); and for remand (Doc. 29) are all due to be **DENIED**.  As a result, this action is due to be **DISMISSED WITH PREJUDICE**.  A separate final order will be entered.

**DONE**, this 28th day of June, 2013.

*John E. Ott*

**JOHN E. OTT**
Chief United States Magistrate Judge